Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 20 2013, 6:11 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KATHRYN C. BYROM**
Kendallville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

**THERESA SEARLES**
Department of Child Services
Albion, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
S.T., Minor Child, )
    )
T.T., Father, )
    )
    Appellant-Respondent, )
    )
    vs. )    No. 57A03-1304-JT-150
    )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
    )
    Appellee-Petitioner. )

APPEAL FROM THE NOBLE SUPERIOR COURT
The Honorable Michael J. Kramer, Judge
Cause No. 57D02-1207-JT-12

**December 20, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

T.T. ("Father") appeals the involuntary termination of his parental rights to his child, S.T. Father raises one issue, which we revise and restate as whether the evidence is sufficient to support the trial court's judgment terminating his parental rights. We affirm.

FACTS AND PROCEDURAL HISTORY

On September 19, 2006, Father signed a paternity affidavit indicating that he was the biological father of S.T., who was born on September 17, 2006. Father had a criminal history prior to S.T.'s birth and in July 2007 was sentenced to three years for domestic battery as a class D felony and a concurrent sentence of one year for possession of marijuana as a class A misdemeanor with all but 180 days suspended.[1] On January 3, 2008, his probation officer filed a petition for probation violation, and Father admitted the violation on March 10, 2008. In October 2009, he was convicted of criminal trespass as a class A misdemeanor and battery as a class B misdemeanor and was sentenced to 180 days for each offense.[2] On December 10, 2009, Father was sentenced to ninety days for resisting law enforcement as a class A misdemeanor for an offense committed on July 1, 2009. Under another cause number, Father was sentenced that same day to fifteen years for manufacturing methamphetamine as a class B felony with five years suspended for an offense committed on April 20, 2009.

---

[1] The chronological case summary ("CCS") for these offenses does not list an offense date but lists April 27, 2007, as the "date filed" and "orig file date." State's Exhibit 5.

[2] The CCS for these offenses does not list an offense date but lists July 2, 2009, as the "date filed" and "orig file date." State's Exhibit 5.

In April 2011, the Department of Child Services ("DCS") received a report that C.H. ("Mother") was arrested for possession of precursors of methamphetamine and had been using methamphetamine in front of her children.[3] At some point, Mother was in the hospital and had placed S.T. and her brother D.H. with her parents.

On April 19, 2011, S.T. and D.H. were removed from Mother's care because the children were with Mother's parents, who had used methamphetamine in front of the children, and Mother could not be located when she was released from the hospital. DCS later learned that Mother did not have stable housing and was using methamphetamine. S.T. and D.H. were placed in licensed foster care, and DCS filed a petition alleging that the children were each a child in need of services ("CHINS"). At the time, Father was incarcerated in Westville Correctional Facility for manufacturing methamphetamine.

On May 13, 2011, S.T. was adjudicated a CHINS. On June 16, 2011, the court entered a dispositional order which did not include specific provisions related to Father. At some point, Father contacted the court to find out how to contact S.T. On October 21, 2011, the court entered an order on periodic case review which stated that Father "will continue to communicate with the child through letters during the course of his incarceration" and ordered Father to complete a number of actions upon his release from incarceration. Appellant's Appendix at 17.

S.T. is considered to be emotionally disabled and has been diagnosed with reactive detachment disorder and occupational defiant disorder. S.T. also has significant dental needs and will require braces, and may also have some type of "auto immune disorder." Transcript at 31.

_____

[3] Mother signed a consent for adoption and does not participate in this appeal.

S.T. was placed in two foster homes and then placed with V.R., S.T.'s fourth cousin and a licensed foster parent, and V.R.'s husband in January 2012. S.T.'s behavior has improved since her most recent placement and she is happy and has developed a strong bond with them. In her current placement, she receives regular medical and dental checkups and regularly attends individual counseling. When she was first placed with V.R. and her husband, S.T. had "a lot of lack of direction," was "pretty wild," wanted to argue with everybody, and "seemed to be about 6 to 8 months behin[d] all the other children her age." Id. at 56, 59. After counseling, S.T. has "changed a lot" and has progressed greatly with a lot of instruction and help from V.R., V.R.'s husband, and pre-school teachers. Id. at 56. S.T. also "came to [V.R. and her husband] as if she were a 30 year old person wanting to boss everybody around and be in control of everything, she had no trust," but by the time of the termination hearing she was "to the level of maybe a 10 year old of responsibility for herself" and was doing "wonderful" in school. Id. at 57, 58.

On June 13, 2011, the court entered an order of paternity which ordered Father to pay child support in the amount of $1.00 per week beginning March 11, 2011. At the time of the termination hearing there was no documentation that the child support was being paid according to Kids Tracks.

On July 6, 2012, the court entered an order on periodic case review and ordered Father to participate in substance abuse, psychological, and parenting-risk assessments and follow all recommendations. The court also ordered Father to enter a halfway house upon his release from incarceration. On September 21, 2012, the court ordered Father to

seek and participate in all available substance abuse treatment classes and parenting classes while incarcerated and to inquire about the CLIFF program while incarcerated; however, Father did not participate in any parenting or substance abuse classes.

Father was available for court hearings by telephone and was provided information regarding the CHINS case and S.T.'s care. Father wrote to S.T. sporadically. During the approximate two year length of the case, Father wrote S.T. about twelve letters and sent handkerchiefs with pictures of cartoon characters on them. Initially, S.T. hoarded Father's letters, but by the time of the termination hearing, V.R. would read the letters to her, but S.T. did not seem interested and would be "off running and playing after the first couple of sentences." Id. at 65.

On July 27, 2012, DCS filed a petition for involuntary termination of the parent-child relationship between Father and S.T. On March 28, 2013, the court held a hearing on the petition to terminate. At the time of the hearing, S.T., who was then six and one-half years old, had been removed from her parents' care for approximately twenty-three months and had resided with V.R. and her husband for approximately fifteen months. Father was still incarcerated for manufacturing methamphetamine, his release date was scheduled for August 25, 2014, and S.T. had not expressed interest in visiting Father.

Dominque Carmer, the family case manager ("FCM"), testified that to her knowledge Father had not participated in any substance abuse or parenting classes.[4] The

---

[4] With respect to the CLIFF program, the following exchange occurred during the re-cross examination of the FCM:

| [Father's Counsel]: | Miss Carmer do you know if he's at a facility that has the CLIFF program available? |
|---|---|
| [FCM]: | Um, I believe that it's offered at all DOC. |

FCM testified that the continuation of the parent-child relationship posed a threat to S.T.'s well-being, stating:

> S.T. does not have a significant relationship with her dad because he's been incarcerated since before her third birthday um, they have never had the chance to build a relationship um, she now is in, has been in a stable home for um, a little over a year and it's the first stable home that she has been in ever um, because he's not, his release date is not for another year it would take time to build that stable relationship; he hasn't participated in services while incarcerated um, and so he would need work um, significantly to do that and S.T. um, S.T. is scared of him just because she doesn't know him um, and so that's a barrier to them building a relationship as well.

Id. at 23-24. When asked what concerns she had if termination were not granted, the FCM testified: "[C]oncerns would be that um, possible um, detriment toward S.T. of the loss of the stable relationship that she has with the relatives that she's currently placed um, the time frame for um, when the possible reunification would take place because um, [Father's] out date is not for another year um, just emotional detriment to S.T. in that

---

| [Father's Counsel]: | It's not. |
| [FCM]: | Okay. |
| [Father's Counsel]: | So do you know if he's at a facility that has it? |
| [FCM]: | Um, no that's why he was asked to inquire about it. |
| [Father's Counsel]: | Did you inquire about it as his family case manager to help him out? |
| [FCM]: | I did not no. |
| [Father's Counsel]: | But you ordered him to do it? |
| [FCM]: | Correct. |
| [Father's Counsel]: | Not knowing if it was even available? |
| [FCM]: | He was ordered to do it correct, to inquire about it. |

Transcript at 54-55.

manner." Id. at 24. The FCM also believed that the problems which led to S.T.'s removal would not be remedied because Father was still incarcerated and would be incarcerated for the next year and he did not have the ability to work towards reunification. The FCM also testified that reunifying S.T. with Father would be detrimental to S.T.'s well-being, and that if termination was granted, the plan for S.T. would be for adoption by her current relative placement.

Wini Rogers, the court appointed special advocate ("CASA"), testified that S.T. is "doing well, very good" in her current placement and that V.R.'s home is clean and safe. Id. at 85. The CASA testified that she thought that the plan for V.R. and her husband to adopt S.T. following termination would be a "good move" and agreed with that plan. Id. at 86. On cross-examination, the CASA acknowledged that she was unaware of Father's plans upon release. On redirect examination, the CASA stated that all children need permanency and security, that S.T. has a strong bond with her brother, and that S.T. and her brother should be together and adopted together.

Father testified that he was in two programs that would alter his projected release date. Specifically, he was in a problem solving program that he should have completed the previous Tuesday, but the teacher quit, and that his completion of that class would result in a reduction of his sentence by 180 days. Father also stated that he was in a G.E.D. program which he began about a month prior to the beginning of his problem solving class, and that he would receive a "time cut" of six months for the completion of his G.E.D. Id. at 93. He testified that following his completion of the two programs he would be released in August 2013, that the CLIFF program was not available at Westville

7

Correctional Facility, and that he signed up for substance abuse and parenting class the second day of his incarceration but has not been offered those classes because of Department of Correction policy. Father further testified that he had to complete his G.E.D. before entering a substance abuse class and that once he completes his problem solving class he would be able to start his substance abuse class because he can be in only two classes at one time. Regarding child support, he testified that $4.34 is garnished from his pay every month. Father's plan following release was to live with his sister in Kendallville and, although he did not have employment available "right off the bat," he stated he has a work history, that his brother-in-law has transportation, and that he was going to try to obtain a job with him. Id. at 103.

At the end of the hearing, the court took the matter under advisement. On March 28, 2013, the court entered an order terminating Father's parental rights to S.T. Specifically, the court's order states:

FINDINGS OF FACT

The court finds by clear and convincing evidence that:

\* \* \* \* \*

7.      The child has been diagnosed with Reactive Attachment Disorder and Oppositional Defiant Disorder. Upon her placement with relatives in January, 2012, the child was defiant, argumentative, and difficult to control.

8.      The child was placed in counseling at that time.

9.      The child has responded well to the placement and counseling and her behavior has improved, but the child continues to suffer from emotional problems[.]

8

10. The child has bad memories of [F]ather and is afraid of contact with him.

11. The child has significant dental problems, has caps on teeth, has lost her upper "baby" teeth prior to the eruption of the permanent teeth, and will need braces.

12. The child may also suffer from an auto-immune disease. She has been ill and missed school each week since December, 2012.

13. The child requires a great deal of attention and patience from her caregiver.

14. The child has difficulty with verbal expression.

15. The child is very bonded to her younger half-brother.

16. The parental rights to the child's younger brother have been terminated and he will be adopted by the current relative placement for both children.

17. Father has been continuously incarcerated in the Indiana Department of Correction since prior to the date the child was removed.

18. Father is serving a sentence for manufacturing methamphetamine and will be on probation upon his release.

19. Father's current release date is estimated to be in August, 2014, but if he completes programs the date could be sooner.

20. In 57D02-1104-JC-046 in addition to requirements if he were released from custody, [F]ather was ordered to attempt to enter the CLIFF program at the Department of Correction or to attempt to complete substance abuse treatment and a parenting class. Father has not entered any of the programs and testified that the failure was due to the Department of Correction's policy.

21. Father is in a Problem Solving Class and GED class and cannot enter any additional classes.

22. Father has approximately fourteen (14) criminal convictions, some of which include convictions for manufacturing methamphetamine, felony domestic battery, felony operating a vehicle while intoxicated, battery, possession of methamphetamine, possession of

9

marijuana, and resisting law enforcement. Father has prior violations of probation which resulted in revocation and a jail sentence.

23. Once he is release[d], [F]ather will live with his sister and her husband, who will provide shelter, food, and transportation. He has no job prospects at this time.

24. The child's Department of Child Services [FCM] testified that if [F]ather's parental rights are not terminated, she fears the child's loss of a stable home and relationship, the amount of time it could take to reunify the child with [F]ather, and the emotional effect on the child.

25. Father was ordered to pay support in the amount of One-Dollar ($1.00) per week. The [FCM] testified that the state child support collection records indicate that no payments have been received. Father testified that support payments have been withheld from his state pay.

26. Father has sent eight (8) to ten (10) letters to the child since she was removed.

27. DCS has developed a permanency plan of adoption for the children by the relatives with whom the child is placed.

28. The Court Appointed Special Advocate in the case testified that the home of the placement and prospective adoption is clean, the child has her own room, and she is well-fed and cared for.

CONCLUSIONS OF LAW

A. There is a reasonable probability that the conditions that resulted in the children's removal and reasons for the placement outside the child's home will not be remedied because [F]ather is unable to care for the child.

B. Twenty-three (23) months have elapsed since the child was removed from his mother and twenty-one (21) months since the dispositional decree was entered.

C. Termination is in the best interests of the child in that she needs permanency and a stable home and not face the reasonable possibility of removal from what has become her home.

10

D.     As of the date [F]ather is currently scheduled to be released, the child would have been removed forty (40) months, which is an unreasonable length of time. The time by which [Father] could reasonably be considered for placement is even longer.

E.     The child's placement outside her present placement would remove her from her half-brother, to whom she is bonded.

F.     The child has needs that can best be met by termination of parental rights and adoption.

G.     The Noble County Office of the Indiana Department of Child Services has a satisfactory plan for the care and treatment of the child, which is continued placement in foster care through the CHINS case and future adoption by relatives.

Appellant's Appendix at 5-7.


DISCUSSION

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct.

11

1197 (2002); see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

    (i)      There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

12

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added).

Father challenges some of the trial court's findings and the court's conclusion that there is a reasonable probability that the conditions that resulted in S.T.'s removal and reasons for the placement outside the home will not be remedied because Father is unable to care for S.T. DCS argues that Father's challenges to the factual findings are merely a request to reweigh the evidence and that the evidence and reasonable inferences drawn from that evidence support the findings challenged by Father. DCS contends that it presented sufficient evidence that Father would not remedy the conditions that resulted in S.T.'s removal and/or the reasons for continued placement outside of Father's home.

A.    Findings

We initially address Father's arguments regarding some of the findings in the trial court's order.

1.    Paragraph 10

Father points to Paragraph 10 which states: "The child has bad memories of [F]ather and is afraid of contact with him." Appellant's Appendix at 6. Without citation to the record, Father argues that he had been regularly communicating with S.T. while incarcerated via "letter and handkerchiefs with pictures," that "[r]elative placement

13

explained that S.T. hoarded the letters, framed one, and had started a pillow with another," and that S.T. worked on writing letters back to Father.[5] Appellant's Brief at 10. Father also contends that while the FCM explained that S.T. was unsure, scared, and had memories that were not positive with Father, the FCM never stated that S.T. was afraid of contact with Father.

During cross-examination, the FCM testified that S.T. stated that "she's unsure of [Father], she's scared of him, she has memories of her dad that aren't positive memories." Transcript at 40. V.R. testified that after S.T. received Father's letters and handkerchiefs she usually hoarded them and that initially V.R. and S.T. would place the handkerchiefs in picture frames and started a pillow with the handkerchiefs, but after receiving the third or fourth handkerchief, S.T. would usually place the handkerchief in a drawer. We cannot say that the trial court clearly erred in Paragraph 10.

2.     Paragraph 20

Father alleges that DCS did not present sufficient evidence to support Paragraph 20 which states:

> In 57D02-1104-JC-046 in addition to requirements if he were released from custody, father was ordered to attempt to enter the CLIFF program at the Department of Correction or to attempt to complete substance abuse treatment and a parenting class. Father has not entered any of the programs and testified that the failure was due to the Department of Correction's policy.

Appellant's Appendix at 6. Without citation to the record, Father argues that he was not able to attempt to enter the CLIFF program because it was not available at Westville

---

[5] We remind Father that Ind. Appellate Rule 46(A)(8)(a) provides that "[t]he argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22."

Correctional Facility and had signed up for parenting and substance abuse classes but had not been placed in either program by the Department of Correction by the date of the termination hearing. We cannot say that Father's argument suggests that Paragraph 20 was not supported by the evidence as the court acknowledged Father's testimony.

     3.     <u>Paragraph 23</u>

Father alleges that sufficient evidence does not support Paragraph 23 which states:

> Once he is release[d], father will live with his sister and her husband, who will provide shelter, food, and transportation. He has no job prospects at this time.

<u>Id.</u> Without citation to the record, Father argues that he explained that he had the potential for employment with his brother-in-law, had a history of maintaining employment, and ultimately plans to work to support S.T. We note that on cross-examination, when asked whether he had secured employment following his incarceration, Father responded by stating: "Um, no mam that's hard to do." Transcript at 116. Again, we conclude that the evidence supports this finding.

B.     <u>Reasonable Probability that Conditions Will Not be Remedied</u>

Father challenges the court's conclusion that "[t]here is a reasonable probability that the conditions that resulted in the children's removal and reasons for the placement outside the child's home will not be remedied because [F]ather is unable to care for the child." Appellant's Appendix at 7. Father argues that he was actively participating in programs which provided for statutory time cuts totaling one year, and that he maintained employment while incarcerated. He contends that DCS did not present evidence that he had a history of alcohol and drug abuse or neglect. He points out that while he was

incarcerated he had $4.34 per month garnished from his state pay at Westville Correctional Facility for child support and DCS failed to present sufficient evidence of his failure to support S.T. Father also asserts that his criminal history did not prevent him from caring for S.T. in the past and that the majority of his criminal offenses occurred prior to S.T.'s birth. DCS posits that Father's current condition of being incarcerated and habitual pattern of criminal activity related to violence and substance abuse demonstrate that there is a substantial probability of future neglect or deprivation.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside the home will not be remedied, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing and take into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. However, the trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id.

We also observe that a parent's character is at issue in proceedings to terminate parental rights. See Matter of D.G., 702 N.E.2d 777, 780 (Ind. Ct. App. 1998) (holding that specific instances of character, including evidence regarding a previous termination of parental rights, is admissible character evidence in a subsequent termination proceeding). Indeed, a parent's character is an integral factor in assessing a parent's fitness and in determining the child's best interest. Id. Also, this court has previously observed that in deciding whether to terminate a parent's parental rights, a court may properly consider evidence of that parent's criminal history, drug and alcohol abuse,

16

history of neglect, failure to provide support, and lack of adequate housing and employment. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). This is because although a court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions, it must also, due to the permanent effect of termination, evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

The record reveals that Father's criminal history includes offenses committed prior to S.T.'s birth. Specifically, in February 1998, Father pled guilty to operating while intoxicated as a class A misdemeanor. In August 2001, Father was charged with fleeing from law enforcement as a class A misdemeanor, public intoxication as a class B misdemeanor, disorderly conduct as a class B misdemeanor, and battery as a class B misdemeanor. Father pled guilty to resisting law enforcement as a class A misdemeanor and battery as a class B misdemeanor, and the remaining counts were dismissed. In August 2002, Father was convicted of operating a vehicle while intoxicated as a class D felony and possession of marijuana as a class A misdemeanor. On August 5, 2005, Father was sentenced to one and one-half years with one year suspended for possession of methamphetamine as a class D felony. That same month, Father was sentenced to 180 days for battery as a class A misdemeanor under another cause number.

S.T. was born on September 17, 2006, and less than a year later in July 2007, Father was sentenced to three years for domestic battery as a class D felony and a concurrent sentence of one year for possession of marijuana as a class A misdemeanor with all but 180 days suspended. On January 3, 2008, Father's probation officer filed a

petition for probation violation, and Father admitted the violation on March 10, 2008. In October 2009, Father was convicted of criminal trespass as a class A misdemeanor and battery as a class B misdemeanor and was sentenced to 180 days for each offense. On December 10, 2009, Father was sentenced to ninety days for resisting law enforcement as a class A misdemeanor for an offense committed on July 1, 2009. Under another cause number, Father was sentenced that same day to fifteen years for manufacturing methamphetamine as a class B felony with five years suspended for an offense committed on April 20, 2009.

With respect to his substance abuse, we observe that on cross-examination, he testified that he completed a substance abuse treatment program through probation in LaGrange County in 2008, that he had charges in 2009 for manufacturing methamphetamine and possession of marijuana, and that it was safe to say that he did not benefit from the substance abuse program.

At the time of the termination hearing, S.T. was approximately six and one-half years old, and Father had been incarcerated for over three and one-half years. This court will reverse a termination of parental rights "only upon a showing of 'clear error' – that which leaves us with a definite and firm conviction that a mistake has been made." Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). Father's arguments amount to an impermissible invitation to reweigh the evidence. See In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. We find no error here.

For the foregoing reasons, we affirm the trial court's involuntary termination of Father's parental rights to S.T.

Affirmed.

ROBB, C.J., and BARNES, J., concur.